IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11–cv–02050–PAB–KMT

MICHAEL TIVIS,

      Plaintiff,

v.

BEVERLY DOWIS, in her individual and official capacity as Health Service Administrator for
SCF,
NICOLE WILSON, in her individual capacity,
DR. PAULA FRANTZ, in her individual and official capacity as Chief Medical Officer for the
Colorado Department of Corrections,
MEGHAN REED, in her individual capacity and official capacity as ADA Inmate Coordinator
for the State of Colorado,
PHYSICIAN HEALTH PARTNERS, INC. d/b/a CORRECTIONAL HEALTH PARTNERS, a
Colorado Corporation, and
DR. STEVEN KREBS, in his individual capacity,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

_____

**Magistrate Judge Kathleen M. Tafoya**

      This case comes before the court on the "PHP Defendants' Motion for Summary

Judgment," filed by Defendants Physician Health Partners, Inc. d/b/a Correctional Health

Partners (PHP) and Dr. Steven Krebs (collectively, the "PHP Defendants") (Doc. No. 181, filed

July 15, 2014 [PHP Defs.' Mot.].)  Plaintiff's Response to the PHP Defendants' Motion for

Summary Judgment was filed on September 9, 2014 (Doc. No. 197 [Resp. PHP Defs.' Mot.])

and the PHP Defendants filed their Reply on September 30, 2014 (Doc. No. 211 [PHP Defs.'

Reply]).

The court also addresses Defendant Beverly Dowis, Nicole Wilson, and Meghan Reed's (collectively, the "CDOC Defendants") "Motion for Summary Judgment."  (Doc. No. 190, filed Aug. 15, 2014 [CDOC Defs.' Mot.].)  Plaintiff's Response to the CDOC Defendants' Motion for Summary Judgment was filed on September 26, 2014 (Doc. No. 207 [Resp. CDOC Defs.' Motion]) and the CDOC Defendants' Reply was filed on October 29, 2014 (Doc. No. 219 [CDOC Defs.' Reply]).

## PROCEDURAL HISTORY

Plaintiff originated this action *pro se* by filing his original Prisoner Complaint.  (Doc. No. 1.)  District Judge Philip A. Brimmer dismissed Plaintiff's original Prisoner Complaint on August 22, 2012.  (Order, Doc. No. 87.)  However, as part of his Order dismissing the original Prisoner Complaint, Judge Brimmer granted Plaintiff leave to file an Amended Complaint asserting an Eighth Amendment claim relating to the treatment of his staph infection.  (*Id.*)

Plaintiff subsequently retained counsel and, after receiving several extensions of time (*see* Doc. Nos. 97, 99, 103), filed an Amended Complaint on February 5, 2013.  (Doc. No. 104.) This court subsequently struck the Amended Complaint, however, because it exceeded the scope of Judge Brimmer's Order.  (Order, Doc. No. 112, filed March 13, 2013.)  On April 30, 2013, Plaintiff filed an Amended Complaint in compliance with Judge Brimmer's Order (Doc. No. 121.)

On May 6, 2013, shortly after filing his Amended Complaint, Plaintiff filed a Motion for Leave to Amend the Operative Complaint seeking to add additional claims for relief.  (Doc. No. 122.)  On June 25, 2013, the court granted Plaintiff's Motion to Amend (Order, Doc. No. 137)

2

and Plaintiff's Second Amended Complaint was filed contemporaneously with that Order (*see* Doc. No. 138 [SAC].)

Plaintiff's Second Amended Complaint asserts seven claims for relief: three claims under 42 U.S.C. § 1983 for violations of the Eighth Amendment against Defendants Dowis, Wilson, and Krebs, respectively; a claim for violations of the Americans with Disability Act (ADA) against Defendants Paula Frantz, Reed, and Dowis; a claim for violations of the Rehabilitation Act of 1973 against Defendants Reed and Dowis; a state law claim for negligence against PHP and Steven Krebs; and a state law breach of contract claim against PHP. (*See generally* SAC.)

Defendant Stephen Krebs and PHP filed an Answer on October 14, 2013. (Doc. No. 154 [PHP Defs. Answer].) After receiving several extensions of time to respond to the Second Amended Complaint (*see* Minute Orders, Doc. Nos. 141, 147), the CDOC Defendants filed an Answer and a Partial Motion to Dismiss on October 18, 2013. (Doc. Nos. 155 & 156.)

On August 11, 2014, the court entered a Recommendation that the CDOC Defendants' Partial Motion to Dismiss be granted and that Plaintiff's § 1983 claim against Defendant Wilson, ADA claim, and Rehabilitation Act claim be dismissed with prejudice. (Doc. No. 189.) Judge Brimmer adopted this Recommendation on December 29, 2014. (Order, Doc. No. 220.) Accordingly, the court recommends that the CDOC Defendants' Motion for Summary Judgment be denied as moot to the extent it seeks summary judgment on Plaintiff's § 1983 claim against Defendant Wilson, ADA claim, and Rehabilitation Act claim. Further, because the only remaining claim against the CDOC Defendants is Plaintiff's § 1983 claim against Defendant

3

Dowis, the following statement of facts relates only to that claim and the claims against

Defendant Krebs and PHP.

## STATEMENT OF FACTS

Plaintiff is an inmate with the Colorado Department of Corrections (CDOC) and has been

incarcerated at Sterling Correctional Facility (SCF) since 2008.  (SAC ¶¶ 9-10.)  Generally,

Plaintiff alleges that Defendants denied and delayed medical treatment for a staph infection and

other complications he experienced following a June 2009 total hip replacement surgery.  (*See

generally id.*)

**A.      *Defendant Dowis's Role in Inmate Treatment***

Defendant Dowis, a licensed registered nurse, is the Health Services Administrator at

SCF.  (*Id.* ¶ 2.)  In that role, Defendant Dowis provides "operational and supervisory oversight of

multidisciplinary clinical service staff working in state correctional facilities."  (Resp. CDOC

Defs.' Mot., Ex. A-4, July 24, 2012 Trial Tr. 5:4-6 in *Self v. Milyard et al.,* Case No. 11-cv-

00813-RBJ-CBS (D. Colo.) [hereinafter "*Self* Trial Tr.].)  Defendant Dowis also is responsible

for ensuring "operational and administrative compliance with [C]DOC administrative

regulations, clinical standards and procedures, [and] American Correctional Association

standards."  (*Id.* 5:12-20.)  Beginning in 2011, Defendant Dowis was responsible for reviewing

all Step 2 offender grievances relating to medical issues.  (*Id.* 9:18-19.)

**B.      *PHP and Defendant Krebs's Role in Inmate Treatment***

PHP is a Colorado corporation that provides "utilization management services" for

inmates incarcerated in the CDOC pursuant to an annual contract.  (PHP Defs. Answer ¶ 6; PHP

Defs.' Mot., Ex. A-1, Deposition of Steven Krebs 51:20-52:10 [Krebs Dep.]; *see also id.,* Ex. A-2.)  PHP does not provide treating physicians or health care providers to the CDOC.  (PHP Defs.' Mot., Ex. A-4, at 6-7; Krebs Dep. 15:20-21.)  Instead, CDOC inmates receive medical care within their correctional facility from primary care providers, which may be a physician, nurse practitioner, or physician's assistants.  (*See* Krebs Dep. 16:15-17:1.)

Inmates may also be referred by primary care providers to specialists for outside medical care.  However, providers are required to obtain pre-authorization for outside services, such as surgical procedures, from PHP.  (Krebs Dep. 18:19-24, 20:1-22; PHP Defs.' Answer ¶¶ 101-104.)  Thus, PHP acts as an administrator, processing requests from treating physicians and health care providers outside the CDOC's internal medical system to determine the medical necessity and propriety of requests for treatment.  (PHP Defs.' Mot, Ex. A-4 at 6-7; Krebs Dep. 16:8-11.)  Providers may request pre-authorization for a procedure by sending a request and supporting medical records to PHP.  (Krebs Dep. 19:20-20:22.)

Defendant Krebs is a physician employed by PHP.  (PHP Defs.' Answer ¶ 7.)  Defendant Krebs's duties include reviewing and approving pre-authorization requests for surgical and medical procedures.  (*Id.* ¶ 102.)

## C.    *Plaintiff's Medical Issues and Treatment*

On June 29, 2009, Plaintiff underwent a total left hip replacement involving the installation of an implant to correct degenerative joint disease.  (*Id.* ¶ 12; PHP Defs.' Mot., Ex. A-5, Deposition of Michael Tivis 15:10-14 [Tivis Dep.].)  Shortly after his surgery, Plaintiff

5

began to feel sharp, intense pain in his hip.  (Resp. CDOC Defs' Mot., Ex A-1, Declaration of

Michael Tivis, ¶ 4 [Tivis Decl.].)

In August 2010, the manufacturer of Plaintiff's implant voluntarily recalled the device,

acknowledging that it suffered from several defects including "component loosening and

component mal-alignment."  (SAC ¶ 13.)  In December 2010, Plaintiff learned that the

symptoms he was experiencing were consistent with symptoms known to be caused by the

implant installed during his June 2009 surgery.  (Tivis Decl. ¶ 9.)  In January 2011, Plaintiff filed

a grievance with the SCF medical staff stating that "it was very possible the severe inflammation,

severe pain around the hip implant joint and groin area [were] products of a defected [sic]

implant" and requested that the hip implant be removed.  (*Id.* ¶ 10.)

In the spring of 2011, Plaintiff started to hear and feel a "clunking" sound in his left hip.

(*Id.* ¶ 11.)  Plaintiff had trouble walking and almost anytime he rotated his hip, it caused him

excruciating pain.  (*Id.*)

On October 25, 2011, Plaintiff saw Dr. Michael Lahey, an orthopedic specialist in

Sterling, Colorado.  (PHP Defs.' Mot., Ex. A-9 at 41-42.)[1]  Dr. Lahey examined Plaintiff and

concluded that he was likely suffering from "infection and aseptic loosening" of the left hip.  (*Id.*

at 41.)  Dr. Lahey concluded that Plaintiff would need a "work up for a septic total hip,"

including "a hip aspiration, infectious disease consultation and probably staged revision

surgery."  (*Id.*)  Dr. Lahey stated that Plaintiff would be "referred to Denver Health for this."

---

[1] Exhibit A-9, a collection of Plaintiff's medical records, features Bates-stamped page numbers.
However, because the Bates numbers are not consecutive, the court instead refers to the page
numbers created by the court's CM/ECF system upon filing.

(*Id.*)  Plaintiff maintains that Dr. Lahey informed him that "he was lucky to be alive" and that he "would be recommending to SCF providers that Plaintiff be immediately hospitalized."  (Tivis Decl. ¶ 15.)  After the appointment with Dr. Lahey, Plaintiff was returned to SCF.  (*Id.*)

On October 26, 2011, Plaintiff filed a Step Two grievance complaining of the manner in which Defendant Dowis and other SCF medical staff had addressed the complications arising from his hip replacement surgery.  (*See* Tivis Decl. ¶ 18; Resp. CDOC Defs.' Mot., Ex. A-2 at 1.)  Plaintiff stated that even after it was determined that he was suffering from a bone and joint infection, which he maintains should have been considered an emergency, "he still sit[s] at SCF suffering . . . plac[ing] him in imminent danger."  (Resp. CDOC Defs.' Mot., Ex. A-2 at 1.) Plaintiff requested to be placed in a hospital.  (*Id.*)

Defendant Dowis responded to this grievance on November 9, 2011 as follows:  "Mr. Tivis you are scheduled to have your hip evaluated by outside provider and once you have had that appt you will be scheduled for a staffing to address any other new issues and current issues that may not have been resolved by seeing the specilist [sic]."  (*Id.*)

After Plaintiff filed his October 29, 2011 grievance, he was seen by medical providers at SCF on November 22, 2011 (CDOC Defs.' Reply, Ex. A-4 at 30-31), and had his pain medications reviewed on November 1 and 29, 2012 and December 12 and 26, 2011 (CDOC Defs' Reply, Ex A-4 at 29-35.)  In the medical records from the November 22, 2011 appointment, Dr. Fauvel, a doctor at SCF, acknowledged that Dr. Lahey sought to refer Plaintiff to Denver Health for "further ortho care and probable revision."  (*Id.* at 30.)

On January 9, 2012, Plaintiff was transported to Denver Health Medical Center where he was examined in the orthopedic clinic by Physician's Assistant Sara Jurgens.  (Tivis Decl. ¶ 21; PHP Defs.' Mot., Ex A-9 at 7-8.)  PA Jurgens concluded that Plaintiff had a possible septic hip and loosening of the implant hardware.  (*Id.* at 8.)  PA expressed concern that Plaintiff's "markers of elevation are elevated and that he has severe pain with range of motion of the hop, which is very concerning for a septic hip."  (*Id.*)  PA Jurgens further noted that "if it is in fact a septic hip, it needs to be taken care of right away" by removing the hardware and washing out Plaintiff's hip.  (*Id.*)  As such, PA Jurgens planned to obtain an "aspiration arthrogram by interventional radiology as soon as possible" in order to determine whether Plaintiff had a staph infection.  (*Id.*)  PA Jurgens noted that after the aspiration results were reviewed, surgery would be planned at that point if necessary.  (*Id.*)

The following day, January 10, 2012, PHP received a "Utilization Review" containing an urgent request from Denver Health.  (PHP Defs.' Mot., Ex. A-10 at 2.)  The Utilization Review recommended an "aspiration arthrography and hardware removal for potential infection."  (*Id.*)  The request was "approved as submitted" on January 10, 2012, the same day it was received.  (*Id.*)  However, the only procedure listed as approved was the aspiration arthrography.  (*Id.*)

Plaintiff underwent the left hip aspiration on January 17, 2012.  (PHP Defs.' Mot., Ex. A-9 at 43-44.)  However, PA Jurgens did not interpret the results until April 10, 2012.  (*Id.* at 115.)

Plaintiff asserts that in January and February 2012 he submitted numerous kites to medical staff complaining that he was unable to sleep due to the sharp pain and burning in the

area of his hip.  (Tivis Decl. ¶ 47.)  Plaintiff also explained that the Vicodin he was receiving in interim doses was not effectively treating his pain.  (*Id.*)

On February 6, 2012, Plaintiff saw Dr. Fauvel at SCF to follow-up on his orthopedic consultation and aspiration procedure at Denver Health.  (*Id.* at 11.)  Dr. Fauvel noted that "there are no currently available records to review regarding the aspiration results or f/up appt."  (*Id.*)

On February 8, 2012, PHP received a Utilization Review from SCF medical staff requesting pre-authorization for Plaintiff to attend an orthopedic office visit.  (PHP Defs.' Mot., Ex A-10 at 3.)  The request stated: "IM had aspiration of L hip showing few PMN's and coag neg staph.  Xray showed loosening of L hip hardware.  Is this IM needing further hip revision/replacement."  (*Id.*)  The request for an outpatient office visit was approved by PHP on February 14, 2012.  (*Id.*)

On March 13, 2012, Plaintiff submitted another grievance seeking "to be immediately placed in a hospital so I can receive adequate treatment for the staph infection in my (L) hip."  (Resp. CDOC Defs.' Mot., Ex. A-2 at 2.)

Plaintiff was subsequently seen by Nurse Practitioner Trudy Sicotte on March 16, 2012 and then by Dr. Fauvel on March 27, 2012.  (PHP Defs.' Mot.., Ex. A-9 at 26-28.)  After the March 27, 2012 appointment, Dr. Fauvel noted that "Orthopedics has been consulted at Denver Health Medical Center for further discussion of hip replacement and his plan."  (*Id.* at 26.)

Dr. Fauvel saw Plaintiff again on April 9, 2012 and wrote the following note in his medical records:  "IM to continue Vicodin now while I get more info from [Denver Health] ortho clinic about plan.  I have spoken with them and they will locate doctor who saw IM last and have

him return call to me." (PHP Defs.' Mot., Ex. A-9 at 23.)  On April 10, 2012, Dr. Fauvel wrote

an additional note: "Received return phone call from Sarah Jergins [sic] PA at Family Ortho.

She states they have been awaiting approval for surgery on L hip." (*Id.* at 22.)

On April 10, 2012, PA Jurgens interpreted the results of the January 17, 2012 hip

aspiration. (*Id.* at 6.)  PA Jurgens concluded that Plaintiff had a staph infection in his hip and

required surgery—namely, a "total hip arthroplasty osteotomy" on his left hip "with replacement

of antibiotic spacer." (*Id.*)  PA Jurgens stated that "we would like to go forward with the surgery

as soon as possible," but that "[w]e are awaiting approval from his facility." (*Id.*)

On April 16, 2012, Defendant Dowis responded to Plaintiff's March 14, 2012 grievance.

(Resp. CDOC Defs.' Mot., Ex. A-2 at 2.)  Defendant Dowis stated that Dr. Fauvel recently spoke

with the Denver Health orthopedic clinic to get an update on Plaintiff's pending surgery and was

informed that they "were waiting for approval from the insurance company." (*Id.*)  Defendant

Dowis further stated to Plaintiff that his condition was "not currently life threatening" and thus

that it was "medically sound to continue to house [Plaintiff] at SCF." (*Id.*)  Plaintiff maintains

that after receiving Defendant Dowis's April 16, 2012 response he sent her additional letters and

kites, but never heard from her again. (Tivis Decl. ¶ 48.)

On April 23, 2012, Plaintiff filed another grievance stating that the staph infection in his

hip was "life threatening and requires immediate treatment" and requesting that he "be

immediately placed in a hospital so Tivis can receive adequate antibiotics needed to stabilize the

staph infection." (Resp. CDOC Defs.' Mot., Ex. A-2, at 3.)  On May 29, 2012, Anthony

DeCesaro, a Step III grievance coordinator with the CDOC, denied Plaintiff's grievance. (*Id.* at

3.)  Mr. DeCesaro stated that Plaintiff "had been medically evaluated by provider at SCF" and that he could not "second guess the medical professional advice of those professionals regarding [Plaintiff's] diagnosis or treatment." (*Id.*)  Nevertheless, Mr. DeCesaro stated that Plaintiff's "treatment appears to be adequate and appropriate for [his] condition" and that "[r]ecommendations by a specialist are just that, recommendations, which do not necessarily have to be followed by DOC medical." (*Id.*)  Finally, Mr. DeCesaro stated that Plaintiff could request a private physician appointment at his own expense. (*Id.*)

On June 25, 2012, Plaintiff attended an appointment at Denver Health with PA Jurgens. (PHP Defs.' Mot., Ex. A-9 at 4-5.)  PA Jurgens stated in Plaintiff's medical records that "we would like to go forward as soon as possible" with the surgery. (*Id.*)  PA Jurgens further stated that "this has been recommended several times to the facility and has not been approved." (*Id.*)

That same day, June 25, 2012, a Utilization Review requesting pre-authorization to conduct the total hip arthroplasty osteotomy with replacement of antibiotic spacer was received by PHP. (PHP Defs' Mot., Ex A-10 at 4.)  The request was "approved as submitted" one day later, on June 26, 2012. (*Id.*)

Plaintiff underwent surgery on his left hip approximately two months later, on August 31, 2012. (PHP Defs.' Mot., Ex A-9 at 2-3.)  In his Second Amended Complaint, Plaintiff alleges that he has undergone two additional revision surgeries of his left hip and that he remains in the clinic at the Denver Regional Diagnostic Center attempting to rehabilitate his hip. (SAC ¶ 46.)  Plaintiff alleges that it is unlikely he will ever regain full use of his hip. (*Id.*)

11

**LEGAL STANDARD**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the 'moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record.

*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

**A.**   ***Breach of Contract Claim against PHP and Defendant Krebs***

Defendants Krebs and PHP have moved for summary judgment on Plaintiff's state law breach of contract claim against them.  (PHP Defs.' Mot. at 16-20.)  In his Response, Plaintiff "confesses his breach of contract claim" state that he "will file a formal motion to that effect forthwith."  (Resp. at 4.)  Although Plaintiff has not filed a motion to voluntarily dismiss his breach of contract claim, the court recommends that claim be dismissed based on Plaintiff's abandonment of the claim.  *See* Fed. R. Civ. P. 56 (court may issue "any other appropriate order" where a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact.")

**B.**   ***§ 1983 Claims***

Both Defendant Dowis and Defendant Krebs seek summary judgment on Plaintiff's § 1983 claims for violations the Eighth Amendment.

The Eight Amendment's ban on cruel and unusual punishment is violated if a defendant's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle*

13

*v. Gamble*, 429 U.S. 97, 104 (1976)).  A claim for deliberate indifference has both an objective

and a subjective component.  To satisfy the objective component, a prisoner must demonstrate

that his medical need is "objectively, sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825,

834 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir.

1999) (citation omitted).  To satisfy the subjective component, a prisoner must demonstrate that

prison officials acted with a "sufficiently culpable state of mind."  *Farmer*, 511 U.S. at 834.

"'[D]eliberate indifference' is a stringent standard of fault."  *Bd. of Cnty. Comm'rs of Bryan

Cnty. v. Brown,* 520 U.S. 397, 410 (1997).  "A showing of simple or even heightened negligence

will not suffice."  *Id.*; *see also Giron v. Corrs. Corp. of Am.,* 191 F.3d 1281, 1286 (10th Cir.

1999).  Instead, the official must "know[] of and disregard[] an excessive risk to inmate health

and safety."  *Farmer,* 511 U.S. at 837.  That is, "the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference."  *Id.*

Neither the CDOC nor PHP Defendants challenge that Plaintiff's medical need was

sufficiently serious under the objective prong of an Eighth Amendment deliberate indifference

claim.  Accordingly, the court turns to whether Plaintiff can show a genuine issue of material fact

as to whether Defendants Dowis or Krebs acted with the requisite culpable mind state to

establish a § 1983 claim for deliberate indifference.

### 1.      *Defendant Dowis*

The Tenth Circuit has recognized two types of conduct that may constitute deliberate indifference in a prison medical case: (1) a medical professional failing to treat a serious medical condition; or (2) a prison official preventing an inmate from receiving medical care or denying a prisoner access to medical personnel capable of evaluating the need for treatment. *Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000) (citing *Estelle,* 429 U.S. at 105-06; *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)).

Here, there no facts suggesting that Defendant Dowis was directly involved in Plaintiff's medical treatment. As such, Plaintiff's claim against Defendant Dowis invokes the second type of conduct, liability of a "gatekeeper." Gatekeeper liability provides that a medical professional may be held liable for deliberate indifference where she "knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and [] delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Id.* at 1211.

As an initial matter, the court finds that Plaintiff fails to establish a triable issue of fact as to whether Defendant Dowis was deliberately indifferent with respect to the decision to return Plaintiff to SCF, rather than hospitalize him, after his October 25, 2011 appointment with Dr. Lahey. Although Dr. Lahey may have told Plaintiff that he would recommend to SCF providers that Plaintiff be immediately hospitalized (Tivis Decl. ¶ 15), there is nothing in the record to suggest that Defendant Dowis or anyone else at SCF knew of this recommendation. And while

Plaintiff requested to be hospitalized in his October 26, 2011 grievance,[2] he did not refer to Dr. Lahey's recommendation that he be hospitalized.  (Resp. CDOC Defs.' Mot., Ex. A-2 at 1.)

Further, Plaintiff's medical records do not show that Dr. Lahey determined that Plaintiff should be hospitalized.  Instead, the record shows that Dr. Lahey stated that Plaintiff should be referred to Denver Health for further treatment.  (PHP Defs.' Mot., Ex. A-9 at 41.)  Defendant Dowis's November 9, 2011 response to Plaintiff's grievance reflects this recommendation, as it specifically states that Plaintiff had been scheduled to be seen by an outside provider.  (Resp. CDOC Defs.' Mot., Ex. A-2 at 1.)

Further, the undisputed facts show that, prior to his January 10, 2012 appointment at Denver Health, Plaintiff was seen by SCF medical providers on November 22, 2011 (CDOC Defs.' Reply, Ex. A-4 at 30-31), and had his pain medications reviewed on November 1 and 29, 2012 and December 12 and 26, 2011 (*id.* at 29, 32-35.)  There is nothing in the record to suggest that Defendant Dowis knew that this interim course of treatment was inadequate.  *Self,* 439 F.3d at 1232-33 ("where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is

---

[2] The Tenth Circuit has repeatedly held, albeit in unpublished decisions, "that 'the denial of . . . grievances alone is insufficient to establish personal participation in the alleged constitutional violations.'"  *Whitington v. Ortiz,* 307 F. App'x 179, 193 (10th Cir. 2009) (quoting *Larson v. Meek,* 240 F. App'x 777, 780 (10th Cir. 2007)).  Nevertheless, the Tenth Circuit has not "rule[d] out the possibility of liability where the officer denying a grievance has an independent responsibility for the wrong in question and the grievance provides the necessary notice of the wrong or the effective means to correct it."  *Arocho v. Nafziger,* 367 F. App'x 942, 956 (10th Cir. 2010).  Here, because Defendant Dowis, as SCF's Health Services Administrator, is largely responsible for ensuring adequate medical care for inmates, the court finds that her resolution of Plaintiff's grievances requesting medical care and complaining of inadequate medical care is sufficient to establish the requisite personal participation.

unwarranted under [10th Circuit] case law.").  Thus, even viewing the facts in a light most favorable to Plaintiff, the court finds that Plaintiff has not established that, in addressing Plaintiff's October 26, 2011 grievance,  Defendant Dowis delayed or refused to refer Plaintiff to medical professionals capable of treating his condition.[3]

Plaintiff maintains that the "crux of the claim against Dowis" is that she "knew the serious medical condition from which Mr. Tivis suffered and knew that specialists sought approval of treatment of the condition with surgical intervention, yet refused to intervene when delay of that approval or . . . treatment became obvious."  (Resp. CDOC Defs.' Mot. at 13.) Thus, Plaintiff's claim appears to target the delay in Plaintiff's surgery between when PA Jurgens saw the need for surgery in January 2012 and Plaintiff's ultimate surgery in August 2012.

Plaintiff appears to argue that because Defendant Dowis generally knew that Plaintiff had a life-threatening medical issue, she was under an affirmative and ongoing duty to arrange for immediate outside care.  (*See id.*)  The court cannot agree.  The record shows that Plaintiff was regularly treated by both SCF medical providers and outside specialists between October 2011 and his August 2012 surgery.  (*See* CDOC Defs.' Reply, Ex A-4 at 29-56.)  As such, the court finds Plaintiff must show Defendant Dowis knew of a particular issue with respect to that course

---

[3] It does not appear that Plaintiff's § 1983 claim against Defendant Dowis is premised on the failure to treat Plaintiff's condition between December 2010, when Plaintiff first learned that his symptoms were consistent with those that may arise from a defective hip implant, and his October 2011 appointment with Dr. Lahey.  Although Plaintiff filed a grievance in January 2011 requesting that his hip implant be removed, there are no facts in the record regarding who received that grievance or what response Plaintiff received, if any.

of treatment, such as the delay in the approval of his surgery, and disregarded the risk that issue presented to Plaintiff's health and safety.

Here, Plaintiff arguably raised the issue of the delay in his surgery in his March 14, 2012 grievance when he requested "to be immediately placed in a hospital so [he could] receive adequate treatment for the staph infection in [his] (L) hip."  (Resp. CDOC Defs.' Mot., Ex. A-2 at 2.)  However, Plaintiff was seen by NP Sicotte two days later on March 16, 2012 and by Dr. Fauvel on March 27, 2012, neither of whom recommended immediate hospitalization.  (PHP Defs.' Mot., Ex. A-9 at 26-28.)  Moreover, the medical records regarding the March 27, 2012 appointment state that Dr. Fauvel contacted Denver Health to inquire as to the status of Plaintiff's hip surgery.  (*Id.* at 26.)  Defendant's Dowis's response to Plaintiff's March 14, 2012 grievance reflects that phone call, as well as Dr. Fauvel's opinion that Plaintiff's condition was not currently life threatening and that it was medically sound to continue to house Plaintiff at SCF.  (Resp. CDOC Defs.' Mot., Ex. A-2 at 2.)  *See also Self,* 439 F.3d at 1233.  Thus, even though Defendant Dowis did not respond to Plaintiff's grievance until April 16, 2012, there are no facts suggesting that Defendant Dowis prevented Plaintiff from receiving medical treatment or denied him access to medical personnel capable of evaluating his condition.  *Sealock,* 218 F.3d at 1211.

Finally, Plaintiff asserts that after Defendant Dowis's April 16, 2012 grievance response, he never heard from her again despite sending her letters and kites.  (Tivis Decl. ¶ 48.)  However, Plaintiff has not submitted those letters and kites for the court's review; nor has he otherwise discussed their contents.  Without knowing the specific complaints raised by Plaintiff, the court

cannot conclude that Defendant Dowis knew of and disregarded an excessive risk to Plaintiff's health or safety by not responding to those letters and kites.

Altogether, even viewing the facts in a light most favorable to Plaintiff, the court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether Defendant Dowis acted with deliberate indifference to his serious medical needs. As such, the court recommends that Defendant Dowis be granted summary judgment on Plaintiff's § 1983 claim against her.

### 2.      *Defendant Krebs*

Plaintiff's § 1983 claim against Defendant Krebs is based on his failure to approve the surgical intervention allegedly requested by Denver Health in the January 25, 2012 Utilization Review. (SAC ¶¶ 127-133.) Plaintiff acknowledges that Defendant Krebs never directly treated Plaintiff, but instead only approved, or disapproved, particular treatments by outside providers. (Resp. PHP Defs.' Mot. at 3.) As such, like his claim against Defendant Dowis, Plaintiff's § 1983 claim against Defendant Krebs also implicates the gatekeeper theory of deliberate indifference liability.

### a.      *Whether Defendant Krebs Discharged his Duty as a Gatekeeper*

Defendant Krebs maintains that the undisputed facts show that there was no request to approve Plaintiff's hip surgery in the January 10, 2012 Utilization review; instead, he maintains the first request for approval came through the June 25, 2012 Utilization Review. (PHP Defs.' Mot. at 9.) The court disagrees.

The court finds that there is a genuine issue of material fact as to whether Defendant Krebs knew that the January 10, 2012 Utilization Review included a request to approve Plaintiff's ultimate hip surgery.  First, the January 10, 2012 Utilization Review featured a "Request Type" of "Ambulatory Surgery."  (PHP Defs.' Mot., Ex. A-10 at 2.)  It does not appear from the record that an aspiration arthrography is a form of surgery; thus, the request for approval of an "Ambulatory Surgery" may well have referred to Plaintiff's hip surgery.

Second, in addition to recommending that Plaintiff undergo an aspiration arthrography, the Utilization Review also recommended "hardware removal for potential infection." (*Id.*) Although the January 10, 2012 Utilization Review does not use the same precise medical terminology to refer to Plaintiff's ultimate hip surgery as the June 25, 2012 Utilization Review— namely, the former refers to a "hardware removal for potential infection," whereas the latter refers to a "left hip total hip arthroplasty osteotomy with replacement of antibiotic spacer" (*id.* at 3)—it reasonably can be read as a more colloquial reference to that same surgery.  Further, even if the January 10, 2012 Utilization Review was ambiguous as to whether Denver Health sought approval for both the aspiration arthrography and the arthroplasty osteotomy, it clearly features Denver Health's contact information.  Thus, even if there was some confusion, Defendant Krebs could have inquired into the matter further.  (Krebs Dep. 27:2-5 (acknowledging that in considering a utilization review, PHP is permitted to either "authorize, deny, [or] request more information."))

The court acknowledges that PA Jurgen stated that the results of the aspiration arthrography would be obtained first and that "surgery will be planned at that point if necessary."

(PHP Defs.' Mot., Ex. A-9 at 8; *see also id.* ("If the patient does in fact have a septic hip, his hardware will need to be removed and the hip will need to be washed out").)  However, the court is not convinced that this conclusively establishes that she did not request the hip surgery in January 2012.  It may be that she requested approval for both the aspiration and surgical procedures in the January 10, 2012 Utilization Review with the intent that the surgery would not be *scheduled* until after the aspiration results were received.

Indeed, the facts suggest that PA Jurgens believed she had requested approval for Plaintiff's hip surgery in the January 10, 2012 Utilization Review.  First, after reviewing the results of the aspiration arthrography in April 2012 and concluding that Plaintiff required surgery, PA Jurgen stated that "[w]e are awaiting approval from his facility" to conduct the "total hip arthroplasty osteotomy with replacement of antibiotic spacer."  (PHP Defs.' Mot., Ex. A-9 at 6.)  And again, when Plaintiff attended a follow-up appointment at Denver Health on June 25, 2012, PA Jurgens stated that the surgical procedure "had been recommended several times to the facility and has not been approved."  (*Id.* at 5.)

In addition, the facts suggest that Defendant Krebs knew that not approving Plaintiff's hip surgery could pose an excessive risk to Plaintiff's health.  More specifically, at his deposition, Defendant Krebs testified that there was a belief that Plaintiff "had an infected hip that needed attention acutely."  (Krebs Dep. 29:8-9.)  Further, Defendant Krebs acknowledged that an "untreated, infected hip" could result in "severe morbidity or death."  (*Id.* at 29:21-24.)

Ultimately, the court finds that there is a genuine issue of material fact as to whether Defendant Krebs knew that the January 10, 2012 Utilization Review sought approval for Plaintiff

21

to undergo a surgical procedure necessary to address a possibly life-threatening infection, but nevertheless failed to act on that request. At a minimum, the court finds a reasonable jury could conclude that Defendant Krebs knew that the January 10, 2012 Utilization Review contained an ambiguous reference to a surgical procedure such that he should have contacted Denver Health to obtain more information. If these facts are proven true at trial, they would be sufficient to establish that Defendant Krebs knew of and deliberately or recklessly disregarded an excessive risk to Plaintiff's health and safety. *Farmer,* 511 U.S. at 837.

### b. Whether Defendant Krebs's Actions Caused Plaintiff Substantial Harm

Defendant Krebs argues that even if he was deliberately indifferent to Plaintiff's serious medical needs, Plaintiff cannot establish that his actions, or inaction, caused Plaintiff substantial harm. (PHP Defs.' Mot. at 9-10.) More specifically, while Defendant Krebs acknowledges that Plaintiff allegedly underwent two additional surgeries after his August 31, 2012 surgery, Defendant Krebs argues that Plaintiff has not designated an expert witness to testify that the delay in Plaintiff's hip surgery was the cause of those additional surgeries. (*Id.*)

"[A] delay in medical care 'only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm.'" *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (citing *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001). "That 'substantial harm' can be the ultimate physical injury, so long as the prisoner can show that the more timely receipt of medical treatment would have minimized or prevent the harm." *Kikumura v. Osagie,* 461 F.3d 1269, 1292 (10th Cir. 2006) *overruled on other grounds by Robbins v. Oklahoma,* 519 F.3d 1242 (10th Cir. 2008). "The 'substantial harm' can also be an

intermediate injury, such as the pain experienced while waiting for treatment and analgesics."

*Id.* Although not every "twinge of pain" suffered as a result of delay in medical care is

actionable, a deliberate indifference claim may be viable where the pain experienced during the

delay is substantial.  *Id.*

Even assuming that Plaintiff cannot demonstrate that the delay in approving his hip

surgery caused him to undergo additional surgeries after his August 2012 surgery, Plaintiff

asserts he suffered terrible pain between when his condition was diagnosed and his August 2012

surgery.  (*See* Tivis Decl. ¶ 43; *see also, e.g.,* PHP Defs.' Mot., Ex. A-9 at 5, 13, 17, 28, & 35

(medical records stating that Plaintiff was experiencing severe pain.)  Although Plaintiff was

prescribed various pain medications at SCF, Plaintiff asserts that pain medication was ineffective

to manage his pain.  (*See, e.g., id.* at 11, 16-17, & 19; *see also* Tivis Decl. ¶ 32.)  Moreover, even

assuming the pain medication helped reduce Plaintiff's pain, in all likelihood, the hip surgery

constituted the best means to fully alleviate Plaintiff's pain. Accordingly, the court finds there

are sufficient facts in the record to suggest that Defendant Krebs' failure to approve the request

for hip surgery in January 2012 caused Plaintiff substantial harm in the form of significant pain.

Altogether, the court finds that Plaintiff has established a genuine issue of material fact as

to whether Defendant Krebs was deliberately indifferent to his serious medical needs, in

violation of the Eighth Amendment.  Accordingly, the court recommends that the PHP

Defendants' Motion for Summary Judgment be denied to the extent it seeks summary judgment

on Plaintiff's § 1983 claim against Defendant Krebs.

**C.      Negligence Claim against PHP and Defendant Krebs**

The PHP Defendants argue that Plaintiff's negligence claim fails against PHP under the

corporate practice of medicine doctrine.  They also argue that Plaintiff's negligence claim fails as

to Defendant Krebs because Plaintiff has not filed a certificate of review pursuant to Colo. Rev.

Stat. § 13-20-602.  The court agrees with these arguments.

**1.      Corporate Practice of Medicine Doctrine**

The corporate practice of medicine doctrine recognizes that "it is impossible for a

fictional entity, a corporation, to perform medical actions or be licensed to practice medicine."

*Estate of Harper v. Denver Health & Hosp. Auth.,* 140 F.3d 273, 275-76 (Colo. App. 2006)

(citations omitted).  "Under this doctrine, a corporation that employs a physician may not

interfere with the physician's independent medical judgment."  *Villalpando v. Denver Health &*

*Hosp. Auth.,* 181 P.3 357, 364 (Colo. App. 2007) (citations omitted).  Thus, the doctrine

generally shields corporations from vicarious liability for the negligent actions of their physician

employees.  *Estate of Harper,* 140 P.3d at 276.  The only exception to the corporate practice of

medicine doctrine is when a corporation or hospital has committed independent acts of

negligence.  *Id.* (citations omitted).[4]

Here, there is no dispute that Defendant Krebs is a licensed physician employed by PHP,

a corporation.  Further, the court finds that Defendant Krebs' review of the Utilization Reviews

---

[4] In *Pediatric Neurosurgery, P.C. v. Russell,* 44 P.3d 1063 (Colo. 2002), the Colorado Supreme
Court recognized that professional medical corporations could be vicariously liable for the acts
of physician employees.  However, as recognized in *Estate of Harper, Russell* was subsequently
legislatively overruled by a 2003 amendment to Colo. Rev. Stat. § 12-36-134.  *Estate of Harper,*
140 P.3d at 276-278.

in this case constituted the practice of medicine.  Defendant Krebs' role was to determine the necessity and propriety of medical procedures requested by specialists outside the CDOC through a review of the relevant medical records.

Plaintiff maintains that certain aspects of his negligence claim do not involve professional medical negligence and therefore do not fall under the corporate practice of medicine.  More specifically, Plaintiff argues that PHP was obligated to create policies and procedures ensuring that outside physician's request for approval to undertake medical procedures are timely approved, that PHP knew of significant delays in such approval, and that the failure to remedy this problem caused Plaintiff harm.  (Resp. PHP Defs.' Mot. at 14.)  However, the record fails to support these assertions.  The January 10, 2012 and June 25, 2012 Utilization Reviews were both addressed and approved either the same day or within 24 hours.  (PHP Defs.' Mot., Ex. A-10 at 2, 4.)  Further, there is nothing in the record to suggest that these approvals were not timely received by the CDOC.  Ultimately, there are no facts in the record to suggest that the failure to approve Plaintiff's hip surgery in January 2012 was due to any policy or procedural failure by PHP.

The court therefore finds that Plaintiff has failed to establish a triable issue of fact as to whether PHP committed an act of negligence independent from Defendant Krebs' review of the Utilization Reviews.  As such, Plaintiff's negligence claim is barred as to PHP by the corporate practice of medicine doctrine.   Accordingly, the court recommends that summary judgment be granted in favor of PHP on Plaintiff's negligence claim.

### 2.      *Certificate of Review Requirement*

Colorado Revised Statute 13-20-602(1)(a) provides in pertinent part:

In every action for damages or indemnity based upon the alleged professional negligence of . . . a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review for each . . . licensed professional named as a party . . . within sixty days after the service of the complaint . . . against such person unless the court determines that a longer period is necessary for good cause shown.

The certificate must contain an affirmation that the attorney has "consulted with a person who has expertise in the area of the alleged negligent conduct; and . . . [that person] has concluded that the filing of the claim . . . does not lack substantial justification." *Id.* § 13-20-602(3).

A certificate of review is thus required where (1) the claim against a licensed professional is based on professional negligence, and (2) expert testimony is required to establish a *prima facie* case. *Ehrlich Feedlot, Inc. v. Oldenburg,* 140 P.3d 265, 270 (Colo. App. 2006) (citing *Martinez v. Badis,* 842 P.2d 245 (Colo. 1992)). The trial court has discretion to determine whether a certificate of review is required under the circumstances. *Giron v. Koktavy,* 124 P.3d 821, 825 (Colo. App. 2005) (citing *Shelton v. Penrose/St. Francis Healthcare Sys.,* 984 P.2d 623 (Colo. 1999); *see also Miller v. Rowtech, LLC,* 3 P.3d 492, 494 (Colo. App. 2000) (holding that section 13-20-602 is not jurisdictional and that the court has "discretion to determine if a certificate of review is required"). However, failure to file a certificate of review, where required, must result in dismissal of the claim. *Giron,* 124 P.3d at 825 (citations omitted); Colo. Rev. Stat. § 13-20-602(4).

Plaintiff admits that Defendant Krebs was practicing medicine when he was reviewing the Utilization Reviews to determine whether the procedures requested for Plaintiff were

26

medically necessary.  (Resp. PHP Defs.' Mot. at 14.)  Moreover, it is undisputed that Plaintiff

did not file a certificate of review.  Nevertheless, Plaintiff argues that his negligence claim does

not sound in professional negligence because simply alleges that Defendant Krebs "negligently

failed to act on a request for approval of urgent and necessary medical care for Mr. Tivis."  (*Id.*)

Even assuming, that expert medical testimony is not necessary to decide that Defendant

Krebs' outright failure to consider a request to approve a surgical procedure constituted

negligence—as compared to a denial of approval after a considered review—the court finds that

expert testimony is nevertheless required to establish the causation element of Plaintiff's

negligence claim.  *Observatory Corp. v. Daly,* 780 P.2d 462, 465 (Colo. 1989) (elements of a

negligence claim include (1) the existence of a legal duty owed by the defendant, (2) a breach of

that duty, (3) causation, and (4) damages).  More, specifically, to establish that Defendant Krebs

caused his injuries, Plaintiff must show that, had he actually considered the alleged request for

hip surgery contained in the January 10, 2012 Utilization Review, Defendant Krebs would have

been required to approve it under the applicable standard of care.[5]  This aspect of Plaintiff's

negligence claim requires expert testimony on the applicable standard of care.  *Melville v.*

---

[5] The same expert testimony may well be required to establish Plaintiff's Eight Amendment
claim against Defendant Krebs.  However, unlike state law negligence claims, a certificate of
review is not required to pursue a § 1983 deliberate indifference claim.  *Burns v. Ted Laurence,
P.A.,* No. 10-cv-2691-WJM-CBS, 2013 WL 3771280, at *4 (collecting cases to show that
numerous decisions from this district have applied the certificate of review requirement under §
13-20-602 to state law professional negligence claims, but not to Eighth Amendment claims
arising from the same factual circumstances); *see also Rudkin v. Allred,* No. 12-cv-01471-CBS,
2013 WL 1815174, at *3 n.1 (D. Colo. Apr. 29, 2013) (noting that the plaintiff's failure to file a
certificate of review in dismissing a medical malpractice claim, while permitting an Eighth
Amendment deliberate indifference claim to survive a motion to dismiss).  In addition,
Defendant Krebs has not argued with respect to Plaintiff's § 1983 claim that had he considered
the request for surgery, he would not have been required to approve it under the applicable
standard of care.

*Southward,* 791 P.2d 383, 387 (Colo. 1990) (To establish a medical malpractice claim, the plaintiff must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practice by the defendant). Therefore, because Plaintiff failed to file a certificate of review even though expert testimony is required to establish a *prima facie* case of negligence against Defendant Krebs, the court recommends that Defendant Krebs be granted summary judgment on Plaintiff's negligence claim.

WHEREFORE, for the foregoing reasons, the court respectfully

RECOMMENDS that the "PHP Defendants' Motion for Summary Judgment" (Doc. No. 181) be GRANTED in part to the extent it seeks summary judgment on Plaintiff's breach of contract and negligence claims and DENIED in part to the extent it seeks summary judgment on Plaintiff's § 1983 claim against Defendant Krebs. The court further

RECOMMENDS that the CDOC Defendants' "Motion for Summary Judgment" (Doc. No. 190) be GRANTED in part to the extent it seeks summary judgment on Plaintiff's § 1983 claim against Defendant Dowis for violations of the Eighth Amendment and DENIED in part as moot to the extent it seeks summary judgment on the previously-dismissed claims against Defendants Wilson and Reed.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A

general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal

the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th

Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

 Dated this 13th day of February, 2015.

BY THE COURT:

_____

Kathleen M. Tafoya
United States Magistrate Judge

30